# IN THE UNTIED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| BESTY A. CALABRACE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | NO. 3:04-0567 |
| | ) | JUDGE HAYNES |
| JOHN E. POTTER, | ) | |
| Postmaster General, | ) | |
| United States Postal Service, | ) | |
| | ) | |
| Defendant. | ) | |

## M E M O R A N D U M

Plaintiff, Besty A. Calabrace, filed this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. against the Defendant John Potter, Postmaster General, United States Postal Service, her former employer. Plaintiff asserts claims of sexual harassment, constructive discharge and retaliation arising out of her employment at a work station in the Clarksville post office area by its former postmaster. The parties completed discovery.

Before the Court is the Defendant's motion for summary judgment (Docket Entry No. 36) contending, in sum: (1) that Plaintiff's proof fails to establish a prima facie showing of sexual harassment, retaliation or constructive discharge; (2) that Plaintiff's proof focuses on the personal relationship between a former local postmaster and a female employee at another work site that did not impact Plaintiff; (3) that Plaintiff's proof does not establish any severe and pervasive sexual hostility that could support claims of sexual harassment or constructive discharge; (4) that the Defendant had legitimate and non-discriminatory reasons for the action that Plaintiff asserts to be retaliation and the cause of her constructive discharge; and (5) that the alleged retaliatory act was based upon a decision made prior to the filing of Plaintiff's administrative charge of sex

discrimination that was neither timely filed nor subject to timely exhaustion of administrative remedies.

In her response, Plaintiff argues that the conduct of the former postmaster who made remarks to her that Plaintiff deemed sexual in nature, is sufficient for her sexual harassment claim. Further, the former postmaster's affair with a postal employee created a sexually hostile work environment and disparate treatment of female workers. Plaintiff also cites the Postal Service's investigators' discussion of her charge with the former postmaster. Finally, Plaintiff asserts that her reassignment from the Quebecor post office work station occurred after she filed her administrative charge and was in violation of the seniority provisions of the applicable collective bargaining agreement governing postal workers.

## A. Findings of Fact[1]

In 1984, Wayne Scott was the postmaster at the local Clarksville, Tennessee branch of the United State Postal Service. (Docket Entry No. 37, Exhibit A, Scott Deposition at pp. 6-7, 9 and 30). The Clarksville post office branch had a work station at the Quebecor Printing plant that is approximately eight (8) miles from the main post office in Clarksville. The postal service maintained an office at the Quebecor plant to monitor mail preparation at that facility. Scott's duties included the Quebecor workstation, but other postal supervisors actually worked at the Quebecor

---

[1]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986) app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The Court concludes that under the applicable law, there are not any material factual disputes. Thus, this section constitutes findings of facts under Fed.R.Civ.P. 56(d).

2

station. Id. at Exhibit A p. 52.

The Postal Service hired Calabrace in July 1985, as a part time flexible clerk ("PTF") at the "old post office" in Nashville. Id. at Exhibit B, Calabrace Deposition at pp. 5-7. Calabrace requested a transfer to Clarksville's main post office that was granted in 1987. Calabrace worked as a window clerk there, and later as a window technician until 1995 when she requested and received reassignment to the Quebecor office as a Level 6 bulk mail and window technician. Id. at pp. 7, 12, 14, 15, 32 and 33. Plaintiff sought this transfer due to the Quebecor office's workload, the physical work and the financial responsibility of the window technician position. Id. at pp. 15 and 57. At the Quebecor plant, Donna Gilland was Calabrace's immediate supervisor. Id. at pp. 18, 32 and 33. Plaintiff's work schedule was Monday through Friday, 2:00 p.m. to 10:30 p.m. Id. at p. 16.

Between 1996 and 1998, Deborah Monk was a postal clerk at the St. Bethlehem Post Office within the Clarksville area branch and began a consensual sexual relationship with Scott that lasted until 2003 or 2004. Id. at Exhibit A, Scott Deposition at pp. 12, 13 and Exhibit C, Monk Deposition pp. 19 and 62. In 1998, Scott did not work at the St Bethlehem Post Office. Id. at Exhibit A, Scott Deposition at pp. 42-44. The St. Bethlehem office permanently closed in 1998 and Monk was assigned to the main post office at Clarksville. With St. Bethlehem Post Office's closure, the seniority provisions in the Postal Service collective bargaining agreement determined the affected employees' reassignment. Id. at Exhibit A, Scott Deposition and Exhibit M Article 12 of the National Agreement.

At the Clarksville Main Post Office, Monk became general clerk and later Scott's secretary. Id. at Exhibit C pp. 18, 60, 64, 65. Prior to Monk becoming Scott's secretary, other employees had served in that capacity. Id. at Exhibit A, Scott Deposition pp. 46 and 47. Plaintiff believes she could

3

have had the position awarded to Monk as early as 1993, but she did not want the position. During this time, Monk applied for two local postmaster positions but was not selected, rather two other female employees from the Clarksville Post Office were selected. Id. at Exhibit C p 60. Monk wore plain clothes as opposed to a postal uniform for a technician.

In September 2000, Gilland held a pre-disciplinary interview with Calabrace because of Calabrace's attendance problems and tardiness. Gilland had similar discussions with several other employees, including Monk. Id. at Exhibit E pp. 38, 41 and 42. On December 26, 2000 Gilland placed Calabarce on restricted sick leave due to Calabrace's excessive use of sick leave. Gilland required Calabrace to provide documentation for any future request for paid sick leave. Monk was also placed on restricted leave for excessive use of sick leave. Id. at Exhibit C at pp. 51-52 and Exhibit E at pp. 44, 48.

Among Gilland's supervisory duties was to change employees' shifts to maximize the productivity. Id. at Exhibit 10, Gilland Deposition at pp. 30. Prior to spring of 2001, Gilland evaluated the work volume and postal employees' shifts at the Quebecor station and also monitored the number of mailing statements at this facility, who processed those statements and which shifts were most productive. Gilland also would determine the number of trucks loaded to decide whether to add or abolish position(s). Id. at pp. 30-31.

After six publications previously distributed from the Quebecor location were dropped, the Postal Service incurred a monetary loss at that location and a substantial reduction in the work of postal employees at the Quebecor facility. Id. at pp. 31-32. By 2001, approximately 8,000 fewer mailing statements were processed than in 2000. The reduced work volume at Quebecor resulted in the plaint's closure on weekends and the postal clerks leaving work early. Id. at Exhibit I,

4

Maynard Deposition at p. 4. Plaintiff does not dispute this reduced work level at the Quebecor facility. Id. at Exhibit B at p. 39. Plaintiff believes that, "Because Monk was carried on the Quebecor schedule as if she worked there when in fact she did not - this resulted in a loss in marketing hours." (Plaintiff's Response to Defendant's Motion for Summary Judgment, p. 8). Monk did not work at Quebecor and David Rinehart, the finance clerk in Clarksville during the relevant time frame, states that Debbie Monk's work hours were not charged to Quebecor budget.

With the decrease in work volume, the postal employees at the Quebecor station lacked work and Gilland advised Scott to reduce the work force to improve the budget. Id. at Exhibit E at pp. 33-34 and Exhibit A, Scott Deposition at p. 61. By the spring of 2001, Gilland advised postal employees at the Quebecor station that if the reduced workload continued, one position might be abolished.

The postal employees at the Quebecor station appeared unhappy at the prospect of any change, with Tom Campbell and Plaintiff openly expressing their dissatisfaction. Exhibit 22. On September 4, 2001, Tom Campbell told Gilland that if she abolished his position or changed his schedule, he was going to, "drop the bomb on the lovebirds" because he "had pictures" and would call "Jack." Exhibit I pp. 73, 74 and Exhibit H Donna Gilland Affidavit at p. 2. On September 4, 2001, Gilland held a second discussion with Calabrace regarding her tardiness and attendance. Id. at Exhibit E at p. 41 and Exhibit F at p. 91. In a letter dated September 5, 2001, Gilland advised Calabrace of 22 instances of Calabrace's absences and/or tardiness. Exhibit E at pp. 42, 43; Exhibit F at p. 89. On September 20, 2001, Plaintiff verbally complained to Andrew Gregory, acting manager of the Tennessee District, about sexual harassment, preferential treatment, an inappropriate relationship and hostile work environment at the Clarksville branch. Exhibit B at p. 20; Exhibit D

at pp. 8, 9. Plaintiff also complains about Luis Sierra's faxed message that she and Jeff Birthrong received regarding lunch, but another male employee, Tom Campbell, did not received the same message. (Plaintiff's deposition, p. 49).

On October 1, 2001, Plaintiff later reduced her September 20, 2001, verbal complaint to a seven page memorandum that was received by the local post service's Operations Office on October 3, 2001. Id. at Exhibit B at pp. 19-20 and Exhibit D at p. 8. Plaintiff's October 1, 2001, statement was: "In the past few weeks I have become increasingly nervous and anxious to the point that I am constantly tired and in a state of deep depression. . . . I feel like I am being forced to quit my job." Her written complaint contained allegations that spanned more than a decade. Id. at Exhibit 3 at p. 5. On October 1, 2001, Calabrace wrote a letter to Gilland requesting her name to be removed from the restricted sick leave list. Exhibit F at p. 92. On October 3, 2001, Gilland denied Calabrace's request to remove her from the restricted sick list, but stated she would reconsider her decision at the end of the year. Id. at Exhibit F at p. 94.

On October 9, 2001, Jim O'Sell, the once manager of the Postal Services's human resources contacted John Maynard and Joyce Townsend to investigate Calabrace's allegations of abuse of authority, sexual harassment and preferential treatment. On October 12, 2001, Maynard and Townsend began their inquiry and interviewed Plaintiff, Thomas Campbell, Luis Sierra, Donna Gilland and Deborah Monk. In a interview on October 16, 2001, Gilland told investigators, "I plan to eliminate a position at [Quebecor] due to budget cuts of 1000 hours." Exhibit H at p. 3 of 5. On October 19, 2001 investigation, Maynard and Townsend issued their findings in a confidential report to O'Sell and their report did not find any abuse of authority or inappropriate sexual behavior/sexual harassment or preferential treatment. Id. at Exhibit I.

6

On November 29, 2001, Plaintiff was granted leave for arthrosporic surgery. Id. at Exhibit B p. 23 and she did not return to work until January 14, 2002. In the interim, between December 2001 and January 2002, Gilland considered the employee shifts at the Quebecor work station and changed the position to the original employees at Quebecor and assigned two people to Quebecor for the peak hours only at other time, only a single employee worked. Exhibit O at pp. 37, 44, 45. Gilland adjusted Plaintiff's shift, but did not eliminate her shift nor abolish her position. In deciding these assignments, Gilland considered: (1) Plaintiff's prior assignment to the main post office had scheduled of Monday and Tuesday as her days off; (2) Plaintiff's medical and physical restrictions; and (3) that the recent open position at the main post office was sedentary work at a computer. Exhibit O at pp. 34, 35, 37 and 39. Gilland also changed Campbell's hours from 7:00 a.m. to 3:30 p.m. to 10:00 a.m to 6:30 p.m. Id. at Exhibit O at p. 13. Another employee, Ralph Cary was already splitting his time between Quebecor and the main office, working at the Quebecor facility four days a week and at the main office, one day per week. Id. at Exhibit O at p. 68.

On January 8, 2002, Gilland sent Calabrace a letter on her new schedule, location and shift hours: Saturday and Sunday 2:00 p.m. to 10:30 p.m. at Quebecor; Monday and Tuesday days off; and Wednesday through Friday 4:00 a.m. to 12:30 p.m. at the Clarksville main office. The letter did not define Calabrace's responsibilities at the main office, but her position would have been sedentary to accommodate her medical restrictions. The weekends at the Quebecor facility involved little work and would be consistent with Plaintiff's medical restrictions. Exhibit O at pp. 39, 44, 46 and 47.

On January 8, 2002, Plaintiff faxed her medical clearance to return to work. Calabrace's physicians cleared her to return to work, as did the postal service's occupational health nurse. Gilland reviewed the information on Plaintiff's medical restrictions from Marilyn Johnson, R.N.,

who had advised Plaintiff to contact her supervisor. Id. at Exhibit E, Exhibit 7 at p. 3; Exhibit B at p. 26; Exhibit O at p. 39 and Exhibit N Plaintiff's medical clearance and medical restrictions.

Calabrace did not contact either Gilland or the nurse about her ability to perform any tasks nor did she report for work. Exhibit B at p. 26; Exhibit O at pp. 50, 51. On January 16, 2002, after several unsuccessful attempts to reach Calabrace by telephone, Gilland sent Calabrace a certified letter asking Calabrace to contact her immediately, but Gilland's letter was unclaimed. On January 16, 2002, Plaintiff sent a resignation letter addressed to Gilland, citing the schedule change as devastating and causing her to resign. Id. at Exhibit F at p. 26. As to the bases of Calabrace's sexual harassment claim, Calabrace cites Scott's remarks to her prior to 1995 or 1996, such as, "Oh you look nice. Have you changed your hair?" "You've changed your hair, is it lighter? I like that color shin, that's a nice blazer." Exhibit B pp. 54, 55. Prior to 1996, Calabrace asserts that Scott would not look her in the eye when speaking to her, but would gaze down "to her waist area." Exhibit B at p. 55. In her response to the Defendant's motion for summary judgment, Plaintiff insists that "Scott pressured Plaintiff to get a motel room and stay that night." (Response to Defendant's Motion for Summary Judgment, p. 4).

It is undisputed that Calabrace only saw Scott on two or three occasions between 2000 and January 2002. On one of the occasions when Calabrace saw Scott, she initiated the contact by visiting Scott at the main office to discuss training. According to Calabrace, Scott was not friendly during that conversation. Exhibit at B p. 57. On another occasion, Scott walked through the Quebecor with an "advisory group" and made the statement to Calabrace "Oh I thought I'd catch you sleeping." Id. at Exhibit B Deposition at p. 58. Scott did not engage in any conduct towards the Calabrace that she considered inappropriate sexual behavior and Scott did not ask Calabrace for

8

sexual favors. Exhibit B at p. 55, Exhibit J at pp. 3, 10-11. As to the room remark, Plaintiff's deposition reflects that in 1993, 1994, or 1995, she had to attend a conference in Nashville for two days and she planned to drive back and forth both days. Scott advised Plaintiff that to spend the night in Nashville to learn from mingling with conference attendees. (Plaintiff's deposition, p. 56). From the proof, Scott did not attend this conference. As to the Quebecor work station Plaintiff admits that both Scott and Gilland, her immediate supervisor at the Quebecor station, "were never there." (Plaintiff's deposition, at p. 58).

Plaintiff did not report any harassment involving any persons to Gilland. Exhibit B at pp. 55, 56; Exhibit O at p. 53. Plaintiff was the union president and had experience filing grievances. (Joseph Calabrace's deposition, p. 24, Exhibit C). Plaintiff explained that she elected not to file a grievance because she had, "lost faith in the local APW Union" and therefore resigned her position. (Plaintiff's deposition, p. 26).

Plaintiff's husband, Joseph Calabrace stated that between Plaintiff's knee surgery in November 2001, and her knee replacement in 2002, her condition worsened. Exhibit L, Joseph Calabrace deposition taken January 13, 2006, p. 42, hereafter to Exhibit L. Notwithstanding her medical condition, Plaintiff cites the schedule/duty change as the reason for her resignation. Id. at Exhibit F at p. 26; Exhibit B at p. 25; Exhibit L at p. 33. After Plaintiff's resignation, her position at the Quebecor remained vacant.

To be sure, the proof reflects that Sierra admits that when Maynard came to do the investigation he asked for all he had on Betsy Calabrace. Id. at p. 80. Sierra provided all that he had to Gilland then asked Maynard "you don't have anything else on Betsy". Id. at p. 92. Sierra then changed a document to add two (2) new entries: "Talked to Betsy about her tardiness" s/Luis Sierra

9

5-15-01 and "Talked to Betsy about her tardiness" s/Luis Sierra 8/17/Cl. Id. at Exhibit 4, Sierra Deposition thereto. Sierra admits that he back dated these documents and that the original document did not contain these notations. Id. at 77. Sierra did so in response to Gilland's request asking for "more" on Plaintiff. Id.

### B. Conclusions of Law

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment `shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.
>
> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined

a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" <u>Matsushita Electrical Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 355-57 (6th Cir. 1989). <u>But</u> <u>see</u> <u>Routman v. Automatic Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in <u>Celotex</u>

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

<u>Celotex</u>, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." <u>Martin v. Kelley</u>, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. <u>Sims v. Memphis Processors, Inc.</u>, 926 F.2d 524, 526 (6th Cir. 1991)(quoting <u>Kochins v. Linden-Alimak, Inc.</u>, 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of `demonstrating the absence of a genuine issue of material fact,' the nonmoving party

then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that:

> The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1480 (cites omitted). See also Hutt v. Gibson Fiber Glass Products, No. 89-5731 (6th Cir. filed September 19, 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." quoting Liberty Lobby)).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.
>
> * * *
>
> Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would

12

apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- `whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'

Liberty Lobby, 477 U.S. at 248, 252, 106 S. Ct. 2505, 91 L.Ed.2d at 211-212, 214 (citation

omitted and emphasis added).

It is likewise true that

[I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: `The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation

omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must

be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Company,

791 F.2d 43, 46 (6th Cir. 1986) app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion) (citation

omitted).

The Court of Appeals further explained the District Court's role in evaluating the proof on

a summary judgment motion:

A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim.

13

Rule 56 contemplates a limited marshalling of evidence by the nonmoving party
sufficient to establishing a genuine issue of material fact for trial.  This
marshalling of evidence, however, does not require the nonmoving party to
"designate" facts by citing specific page numbers.  Designate means simply "to
point out the location of."  Webster's Third New InterNational Dictionary (1986).

Of course, the designated portions of the record must be presented with enough
specificity that the district court can readily identify the facts upon which the
nonmoving party relies; but that need for specificity must be balanced against a
party's need to be fairly apprised of how much specificity the district court
requires.  This notice can be adequately accomplished through a local court rule or
a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) cert. denied 110 S.Ct. 1839, 108

L.Ed.2d 967 (1990).  Here, the parties have given some references to the proof upon which they rely.

Local Rule 8(b)(7)(A) and (C) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and

other authorities on summary judgment and synthesized ten rules in the "new era" on summary

judgment motions

1.      Complex cases are not necessarily inappropriate for summary judgment.

2.      Cases involving state of mind issues are not necessarily inappropriate
for summary judgment.

3.      The movant must meet the initial burden of showing `the absence of a
genuine issue of material fact' as to an essential element of the non-movant's case.

4.      This burden may be met by pointing out to the court that the respondent,
having had sufficient opportunity for discovery, has no evidence to support an
essential element of his or her case.

5.      A court should apply a federal directed verdict standard in ruling on a motion
for summary judgment.  The inquiry on a summary judgment motion or a directed
verdict motion is the same: `whether the evidence presents a sufficient disagreement
to require submission to a jury or whether it is so one-sided that the party must
prevail as a matter of law.'

14

6.    As on federal directed verdict motions, the `scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.    The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.    The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.    The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.    The trial court has more discretion than in the `old era' in evaluating the respondent's evidence.  The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.'  Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted.  The trial court has at least some discretion to determine whether the respondent's claim is `implausible.'

886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment:  (1) has the moving party "clearly and convincingly" established the absence of material facts?;  (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

For a federal employee to file Tile VII action, the federal employee must first exhaust any available administrative remedies.  42 U.S.C. § 2000e-16; 29 C.F.R. Part 1614; 29 C.F.R. 1614.103(a)(b), set forth the procedure and deadlines to exhaust available administrative remedies

15

as to such a claim, that includes consulting with an Equal Employment Opportunity Commission ("EEOC") counselor with the Plaintiff's agency. 29 C.F.R. § 1614.105(a). This consultation must occur within 45 days of the challenged employment action. In some circumstances the agency or the EEOC may extend the 45 days deadline. See 29 C.F.R. 1614.105(a)(2).

Plaintiff's written administrative complaint in October 1, 2001, charged harassment by Scott's comments about her hair and her blazer. Additionally, Plaintiff alleged that Scott did not maintain eye contact with her when he spoke, but rather let his eyes settle on her mid section. Aside from the merits of this claim as sexual harassment, sex discrimination or hostile work environment, Plaintiff failed to contact an EEOC counselor regarding her complaint until February 13, 2002. None of these claims was timely exhausted as by 29 C.F.R. § 1614.105(a)(1) and are not entitled to be considered in their merits. Plaintiff cannot use the Scott - Monk relationship to excuse her procedural defaults or to toll the time limitations for filing her claims. Even in the merits of Scott's conduct toward Calabrace or other treatment of her, none of the evidence supports a finding of sexual harassment or discrimination.

An employer's discrimination against an employee based upon the employee's sex is prohibited by Title VII. 42 U.S.C. 2000e - (2)(m) and (2). Sexual harassment claims under Title VII involve two types: a quid pro quo discrimination seeking "the exchange of concrete employment favors for sexual favors: and a second category of "harassment that creates an offensive and hostile work environment." Meritor Savings Bank FSB v. Benson, 477 U.S. 57, 65 (1996). For quid pro quo claims that involve supervisors, the Sixth Circuit explained that:

> Where the complaint alleges "quid pro quo harassment, in which a supervisor demands sexual favors as a condition for job benefits, the employer is strictly liable under the respondeat superior theory . . . . regardless of whether the specific acts

complained of were authorized or even forbidden by the employer and regardless of whether the employer knew or would have known of their occurrence.

Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 803 (6th Cir. 1994) (quoting 29 C.F.R. § 604.11(c) and citing Kauffmanv. Allied Signal. Inc.. Autolite Div., 970 F.2d 178, 183, 185-86 (6th Cir. 1992).

The elements of a quid pro quo claim and the proof required to sustain a judgment on such a claim are as follows:

> 1) that the employee was a member of a protected class; 2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; 3) that the harassment complained of was based on sex; 4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted in a tangible job detriment; and 5) the existence of respondeat superior liability.

Highland v. KFC Nat'l Management. From a review of the record, the Court concludes that Plaintiff's proof does not support a judgment on a quid pro claim. See Hollis v. Fleetguard. Inc., 44 FEP Cases 1525 (M.D. Tenn. 1987).

Calabrace 's claims for a sexually hostile environment claims is governed by Harris v. Fork Lift Systems. Inc., 510 U.S. 17 (1993), that articulated the following standard for such claims.

> "[M]ere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile or abusive - is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive then the conduct has not actually altered the conditions of the victim's employfflent, and there is no Title VII violation.
>
> * * *
>
> . . . whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the conduct;

17

its severity; whether it is physically threatening or humiliating, or merely offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

Id. at 21-22, 23.

A distinction must be made between the acts of a co-worker and a supervisor.

Blankenship v. Parke Care Centers. Inc., 123 F.3d 868, (6th Cir. 1997). In Blankenship, the Court stated as to offending co-workers:

In defining the employer's duty in the present case, we must keep in mind that the alleged harasser was not plaintiffs supervisor. When the harasser is a co-worker, the standard for determining employer liability is "markedly different" from that applicable to supervisors, and is not based upon the doctrine of respondeat superior. As discussed above, the employer's liability in cases of co-worker harassment is direct, not derivative; the employer is being held directly responsible for its own acts or omissions. Thus, when an employer responds to charges of co-worker sexual harassment, the employer can be liable only if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known. The act of discrimination by the employer in such a case is not the harassment, but rather the inappropriate response to the charges of harassment.

Id. at 873 (citation omitted).

As a female, Calabrace is a member of a protected class, but she fails to name anyone outside of her protected class, yet otherwise similarly situated, who was treated more favorably than she was treated. Calabrace only saw and/or spoke to Scott on two to three occasions between the years 2000 until her resignation in January 2002. On the occasions that Calabrace saw Scott, Calabrace initiated one encounter by going to Scott's office to discuss training. The other contact occurred when Scott visited Quebecor facility with other persons and made a joke. Neither encounter qualifies as unwelcome sexual advance or request. Plaintiff concedes that Scott did not

18

request sexual favors or make sexual advances to her. Scott's general statements to Plaintiff actual appearance and his failure to look her in the eye when speaking to her do not constitute sexual harassment on discrimination.

To state a claim of constructive demotion or constructive discharge, Calabrace must show that "the employer . . . deliberately created intolerable working conditions, as perceived by a reasonable person," and the employer did so "with the intention of forcing the employee to quit . . ." Logan v. Denny's , Inc., 259 F.3d 558, 568-69 (6th Cir. 2001) (quoting Moore v. Kuka Welding Sys., 171 F.3d 1073, 1080 (6th Cir. 1999)). To prevail on her constructive discharge claim, the work environment and the change to Calabrace's schedule and duty station must be so severe or pervasive that a reasonable person would find the work environment hostile or abusive, and the victim must subjectively regard that environment as hostile or abusive. Calabrace does not allege that either Gilland or Scott physically intimidated her or subjected her to verbal abuse. Calabrace's only other complaint is that Luis Sierra another supervisor yelled at her over the telephone and faxed her some letters. Exhibit B at p. 49. These facts would not support a judgment for a constructive discharge claim.

As to Plaintiff's retaliation, in Richmond-Hopes v. City of Cleveland, 168 F.3d 490 WL 808222 (6th Cir. 1998), the Sixth Circuit noted: "[t]o establish a prima facie case of retaliation, a plaintiff must demonstrate: (1) that she was engaged in activity protected under Title VII; (2) that she was the subject of an adverse employment action; and (3) that there is a causal link between the protected activity and the adverse employment action." Johnson v. U.S. Dep't of Health and Human Services, 30 F.3d 45, 47 (6th Cir. 1994).

Calabrace's protected activity arises when she complained to agency management on

19

September 20, 2001 and on October 1, 2001, when Scott learned of her complaint and was notified of an investigation. Calabrace cites as retaliatory the schedule change that included a change in her work site for three of her five days of the work week, and a change in her scheduled days off and her duty hours. Calabrace cites these changes as retaliation for her complaint about Scott.

Calabrace admits that Gilland discussed the potential operational changes, a schedule change, and perhaps the elimination at the Quebecor postal station before Calabrace made her complaints of harassment and discrimination. Gilland made the decision to change plaintiff's schedule without Scott's involvement. Employers generally have broad discretion to set policies and carry out personnel decision, absent discriminatory motivation, and courts do not second guess Defendant's restructuring decision. The Court concludes that Calabrace's protected activity occurred after the announcement regarding the potential shift changes and the evidence does not establish any causal connection between Calabrace's protected activity and the schedule changes.

At the time of Calabrace's resignation, she held a position with Postal Service, and was represented by the American Postal Workers Union, and was protected by the collective bargaining agreement between the Postal Service and the Union. Article 16 of the agreement outlines discipline procedures available as part of the agreement while Article 15 provides for a comprehensive grievance arbitration procedure for those employees with complaints or disputes, which would include complaints about schedule changes. Calabrace did not utilize the grievance procedure on the alleged conditions that caused her resignation. In any event, Calabrace remained at the Quebecor station for part of her work schedule.

The Court concludes that Plaintiff's proof about the investigation of her administrative complaint occurred after Gilland's decision to change her work schedule due to the admitted

20

reduction in the work at the Quebecor station. The Plaintiff's proof does not establish a causal connection between her administrative oral and written complaints and the change in her work schedule.

For these reasons, the Court concludes that the Defendant's motion for summary judgment should be granted.

An appropriate Order is filed herewith.

**ENTERED** this the ___8th___ day of June, 2006.

WILLIAM J. HAYNES, JR.
United States District Judge